25CA0724 Three-K-Nine v BOCC 07-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0724
San Miguel County District Court No. 23CV30026
Honorable D. Cory Jackson, Judge

Three-K-Nine, LLC, a Texas limited liability company,

Plaintiff-Appellant,

v.

Board of County Commissioners of the County of San Miguel,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Brown and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 16, 2026

Garfield & Hecht, P.C., Christopher D. Bryan, Haley M. Cramer, Aspen,
Colorado, for Plaintiff-Appellant

Maura Fahey, County Attorney, Telluride, Colorado; Thomasson Law, LLC,
Lane P. Thomasson, Ouray, Colorado, for Defendant-Appellee


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     This appeal arises from the district court's determination that the employee housing impact fee adopted by defendant, the San Miguel County Board of County Commissioners (BOCC), complies with Colorado's impact fee statute, section 29-20-104.5, C.R.S. 2025. Plaintiff, Three-K-Nine, LLC, appeals that determination. We affirm.

## I. Background

¶ 2     To understand Three-K-Nine's appeal, we first briefly discuss the nature of the employee housing impact fee (impact fee) and related resolutions adopted by the BOCC. San Miguel County (the County) first adopted the impact fee for building permits in 2007 as part of section 5-13 of the San Miguel County Land Use Code (LUC). The impact fee required developers "to pay to mitigate the impacts of development and land use to the employee housing stock managed or controlled by the County." LUC § 5-1303G.II. The fee schedule proposed in Resolution No. 2007-11 (2007 resolution) was determined based on a "Residential Job Generation Study" (2000 study) and an update to that study completed in 2005 (2005 study). The data from both studies informed the BOCC's decision to adopt

the 2007 resolution, which included a rate schedule that extended through 2015.

¶ 3    In 2021, County staff began a process to update the methodology for calculating the impact fee.  Initially, the County considered hiring an outside consultant to conduct a new study to update the data used to establish the original impact fee schedule but ultimately decided not to do so.  Instead, during the summer of 2022, a senior planner for the County, John Huebner, prepared a report for the BOCC, detailing why the current impact fee model was inadequate to address the scale of the County's employee housing challenges.

¶ 4    In the report, Huebner proposed a new method to update the impact fee structure, based on a market-affordability gap approach (MAG approach), which is also used in the towns of Telluride and Mountain Village.  To this end, Huebner drafted proposed language for the BOCC to consider.  After several public meetings, the BOCC adopted an amendment to the impact fee schedule, based in significant part on the recommendations in Huebner's report.  The amendment, Resolution No. 2022-031 (2022 resolution), became effective July 12, 2022.

¶ 5    The 2022 resolution changed several components of the impact fee schedule, including eliminating a sales tax credit, adopting the MAG approach, and changing the mitigation rate from a flat 37% to a sliding scale based on the size of the structure.  The 2022 resolution faced significant backlash from the community.  In response, the BOCC held a public work session and more public meetings to discuss amendments to the new methodology.

¶ 6    As a result of these sessions, the BOCC amended the 2022 resolution through Resolution No. 2023-09 (2023 resolution), which took effect on March 1, 2023.  The 2023 resolution exempted some home improvements from the impact fee and adjusted the mitigation percentage depending on the square footage of the new development.  The 2023 resolution also authorized a 50% reduction on the impact fee retroactive to July 15, 2022, for any building permit application submitted and deemed complete by May 31, 2023.

¶ 7    In August 2022, Three-K-Nine sought a permit from the County to build an 11,300 square foot single-family house located near Telluride but within the boundaries of the unincorporated County.  The County initially calculated an impact fee of $742,245

3

for the house based on the 2022 amendment. Three-K-Nine appealed this assessment to the BOCC.

¶ 8  Based on the timing of its permit application and the 50% reduction specified in the 2023 resolution, the County reduced Three-K-Nine's impact fee to $371,122. Three-K-Nine appealed the new assessment to the BOCC, and the BOCC denied the appeal.

¶ 9  The County subsequently approved Three-K-Nine's amended building permit application and assessed a new impact fee in the amount of $252,843 because of modifications Three-K-Nine made to the building plans. Three-K-Nine paid that amount but reserved its objection to the fee.

¶ 10  Contemporaneously, Three-K-Nine filed a lawsuit against the County and the BOCC in district court. Three-K-Nine sought a declaratory judgment under C.R.C.P. 57, alleging that the new methodology adopted by both the 2022 resolution and the 2023 resolution (hereafter, disputed resolutions) and the resulting provisions of the LUC do not comply with section 29-20-104.5. Three-K-Nine also sought C.R.C.P. 106(a)(4) review of the BOCC's determination that the County properly calculated its impact fee under the LUC provisions adopted pursuant to the disputed

resolutions rather than the LUC provisions that existed prior to 2022. *See* § 29-20-104.5(7) (allowing any person who has "an interest in land that is or becomes subject to [an impact fee] . . . to file an action for declaratory judgment to determine whether such schedule complies with the provisions of this section" and "to challenge the fee or charge imposed under [C.R.C.P. 106]").

¶ 11 The parties filed cross-motions for summary judgment focused solely on the declaratory judgment claim. In its order resolving that claim, the court first rejected Three-K-Nine's request to exclude expert opinions from Huebner and his supervisor, Kaye Simonson. The court then evaluated the methodology used to calculate the impact fee under the disputed resolutions. It determined that the updates to the methodology were consistent with section 29-20-104.5 and therefore entered summary judgment in favor of the County on Three-K-Nine's declaratory judgment claim. Three-K-Nine appeals that judgment.

¶ 12 Three-K-Nine requested that the district court certify its order as a final judgment for purposes of appeal under C.R.C.P. 54(b). The County did not oppose the motion. The district court granted the motion, finding that there was "no just reason for delay in the

entry of a final judgment on [Three-K-Nine's] C.R.C.P. 57 claim." Because Three-K-Nine's C.R.C.P. 106 claim remains unresolved pending this appeal, our analysis is limited to whether the district court erred by declining to declare that the disputed resolutions violate section 29-20-104.5.

## II. Discussion

### A. Summary Judgment Standard of Review

¶ 13 We review a district court's entry of summary judgment de novo. *City of Aurora v. 1405 Hotel, LLC*, 2016 COA 52, ¶ 11. In doing so, we apply the same standards as the district court. *See Babi v. Colo. High Sch. Activities Ass'n*, 77 P.3d 916, 919 (Colo. App. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c). On review, our task is to determine whether a genuine issue of material fact existed and whether the district court correctly applied the law in granting the motion. *Thomas v. Childhelp, Inc.*, 2024 COA 16, ¶ 13.

¶ 14 In reviewing a motion for summary judgment, the district court may consider "the pleadings, depositions, answers to

6

interrogatories, and admissions on file, together with the affidavits, if any," and shall make its decision based on whether they "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  C.R.C.P. 56(c).  When submitting motions for summary judgment, "the parties may present materials outside the pleadings, including affidavits and other records."  *1405 Hotel, LLC*, ¶ 14.

¶ 15　A court may consider affidavits or sworn reports from expert witnesses in deciding a motion for summary judgment.  *White v. Jungbauer*, 128 P.3d 263, 264 (Colo. App. 2005).  But "affidavits containing mere conclusions are insufficient to satisfy the burden of showing the existence or absence of a genuine issue of material fact."  *Id.*

## B.　The County's Experts

¶ 16　Three-K-Nine argues that the district court improperly considered expert opinion testimony from Huebner and Simonson and should instead have treated the opinion testimony from its expert — Michael Verdone — as undisputed and therefore controlling on the court's analysis.  We are not persuaded by either argument.

¶ 17    The district court's order begins by addressing Three-K-Nine's motion in limine to exclude the opinions of Huebner and Simonson. In resolving the motion, the court began by noting that, to a large extent, Huebner and Simonson were fact witnesses. In their depositions, they testified about the County's deliberative process and explained the mechanics of updating the fee schedule, including the MAG approach.

¶ 18    Although Huebner and Simonson were also designated as expert witnesses and the County provided disclosure statements summarizing their anticipated opinions, neither of them prepared a written expert report for the litigation. *See* C.R.C.P. 26(a)(2)(B) ("If the [expert] witness does not prepare a written report, the party's lawyer or the party, if self-represented, may prepare a statement and shall sign it. The witness's direct testimony expressing an expert opinion shall be limited to matters disclosed in detail in the report or statement."). But Huebner's report to the BOCC and the transcripts of Huebner's and Simonson's depositions were attached as exhibits to Three-K-Nine's motion for summary judgment. And in those sworn depositions, Huebner and Simonson explained

8

Huebner's 2022 report. *See* C.R.C.P. 56(c) (the court may consider depositions when resolving motions for summary judgment).

¶ 19    While Three-K-Nine attempted to limit the purpose for which the district court could consider Huebner's and Simonson's sworn deposition testimony, Three-K-Nine is the party that submitted them as attachments to its motion for summary judgment. These facts undermine Three-K-Nine's reliance on *McDaniels v. Laub*, in which the party opposing summary judgment attempted to create an issue of fact based upon an unsworn expert witness report. 186 P.3d 86, 87 (Colo. App. 2008).

¶ 20    As the district court noted, in resolving a motion for summary judgment, if "neither party disputes the competence or admissibility of evidence offered . . . , [courts] may consider all this record evidence in [their] analysis." *Woodward v. Bd. of Dirs. of Tamarron Ass'n of Condo. Owners, Inc.*, 155 P.3d 621, 624 (Colo. App. 2007). Moreover, the district court noted that the BOCC considered the Huebner 2022 report, related staff memos, and Verdone's reports at the time it adopted the disputed resolution. Thus, the evidence was independently relevant to the district court's assessment of whether the disputed resolutions quantified the "reasonable impacts of

proposed developments on existing capital facilities." *See* § 29-20-104.5(2)(a).

¶ 21    Relatedly, we reject Three-K-Nine's argument that Verdone's opinions were "undisputed" and therefore binding on the court. The district court was not bound to accept Verdone's opinions as undisputed facts, even if they had been uncontroverted. *See White*, 128 P.3d at 264; *see also United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2001) ("[A]n expert opinion is not fact that can be proved true or false. It is opinion."). Moreover, the district court did not reject Verdone's opinions because it found Huebner's or Simonson's opinions more persuasive. Instead, the court considered Verdone's opinions at face value but found them unpersuasive because they were unhelpful. For example, the court rejected various aspects of the Verdone reports because they "misstate[d] the issue, were "conclusory," or "failed to explain the math or logic behind [the] criticism." Finally, the district court noted that "any calculation as technical and nuanced as the MAG Approach is naturally going to be subject to critique and experts will differ on the weight to give a variety of factors to influence the resulting fee." But as the district court reasoned, this is not "legally problematic — the statute

10

demands only that the fee 'reasonably' reflect the impact." *See* § 29-20-104.5(2)(a).  And the court's summary judgment order reflects its focus on this statutory polestar.

¶ 22     For these reasons, we perceive no error in the district court's consideration of the substance of Huebner's 2022 report and Huebner's and Simonson's deposition testimony, including their opinions.  Likewise, we perceive no error in the district court's decision not to accept aspects of Verdone's reports as binding on its analysis.

## C.     Impact Fee Methodology

¶ 23     We next address Three-K-Nine's assertion that the district court erred by concluding that the County's adoption of the disputed resolutions did not violate section 29-20-104.5.  The impact fee statute reads, in relevant part:

> (1) Pursuant to the authority granted in section 29-20-104(1)(g)[, C.R.S. 2025,] and as a condition of issuance of a development permit, a local government may impose an impact fee or other similar development charge to fund expenditures by such local government on capital facilities needed to serve new development.  No impact fee or other similar development charge shall be imposed except pursuant to a schedule that is:

11

(a) Legislatively adopted;

(b) Generally applicable to a broad class of property; and

(c) Intended to defray the projected impacts on capital facilities caused by proposed development.

(2)(a) A local government shall quantify the reasonable impacts of proposed development on existing capital facilities and establish the impact fee or development charge at a level no greater than necessary to defray such impacts directly related to proposed development. No impact fee or other similar development charge shall be imposed to remedy any deficiency in capital facilities that exists without regard to the proposed development.

§ 29-20-104.5.

¶ 24 Three-K-Nine agrees that the disputed resolutions comply with subsections (1)(a) and (b). It contests, however, the district court's conclusion that the disputed resolutions meet the requirements of subsections (1)(c) and (2)(a).

1. Standard of Review and Applicable Law

¶ 25 We review matters of statutory interpretation de novo. *Colo. Prop. Tax Adm'r v. CO2 Comm., Inc.*, 2023 CO 8, ¶ 22. If a statute's terms are clear and unambiguous, we are obligated to apply its plain meaning. *Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004).

12

When reviewing a municipal ordinance or code, we construe it using the same rules that we use in interpreting statutes.

. . . We . . . read statutes and municipal enactments in such a way as to give effect to every word; we must consider the language used in the context of the statute or code as a whole; and we must give effect to the ordinary meaning of the language and read the provisions as a whole, construing each consistently and in harmony with the overall statutory design, if possible. We should reject interpretations that will render words or phrases superfluous and must avoid interpretations that produce illogical or absurd results.

*Treece, Alfrey, Musat & Bosworth, P.C. v. Dep't of Fin.*, 298 P.3d 993, 996 (Colo. App. 2011) (citations omitted).

¶ 26     Likewise, we review a trial court's ruling that an ordinance complies with applicable constitutional and statutory provisions de novo. *See Town of Dillon v. Yacht Club Condos. Home Owners Ass'n*, 2014 CO 37, ¶ 22. If an ordinance violates the United States Constitution or the Colorado Constitution, the ordinance is void. *See Town of Sheridan v. Valley Sanitation Dist.*, 324 P.2d 1038, 1043 (Colo. 1958) (declaring that an ordinance that authorized the confiscation of private property without due process of law was "unconstitutional and void"). Similarly, if an ordinance conflicts

13

with a state statute, the ordinance is void. *See Colo. Mining Ass'n v. Bd. of Cnty. Comm'rs*, 199 P.3d 718, 724 (Colo. 2009) (any local ordinance that conflicts with a state statute is void); *see also* § 30-15-411, C.R.S. 2025 ("No county shall adopt an ordinance that is in conflict with any state statute.").

¶ 27 Generally, an ordinance is "presumed to be constitutional, and the party challenging an ordinance bears the burden to prove its unconstitutionality beyond a reasonable doubt." *Town of Dillon*, ¶ 22. Likewise, an ordinance is presumed to be valid and the party challenging an ordinance carries the burden of proving its invalidity. *See Tri-State Generation & Transmission Co. v. City of Thornton*, 647 P.2d 670, 677 (Colo. 1982) ("The Thornton PUD ordinance is a legislative enactment and is presumed valid.").

¶ 28 As a starting point, we briefly consider seminal United States Supreme Court cases addressing the subject of governmental assessments or impact fees incident to the issuance of a building permit.

¶ 29 In *Nollan v. California Coastal Commission*, a couple sought to build a house on beachfront property. 483 U.S. 825, 827 (1987). The Nollans' property was sandwiched between two public beaches.

*Id.* at 828. When the couple began the permitting process to build the new house, the Coastal Commission imposed a condition requiring them to permit a public easement across their beach so that people could travel between the public beaches. *Id.* The Nollans objected. *Id.* The Court determined that for a development condition to pass constitutional scrutiny, there must be an "essential nexus" between the condition imposed and the government's purpose for imposing it. *Id.* at 836-37. Because the Court concluded that the Coastal Commission had not established that necessary nexus, it concluded the easement condition was unconstitutional. *Id.* at 841-42.

¶ 30    The Court refined *Nollan* several years later, in *Dolan v. City of Tigard*, 512 U.S. 374 (1994). Dolan sought a permit to demolish and rebuild a structure and related parking lot. *Id.* at 379. The government granted Dolan a permit, subject to the conditions that she could not build on the portion of her property situated within the existing floodplain and she must dedicate a fifteen-foot strip of land adjacent to the floodplain boundary for a "pedestrian/bicycle pathway." *Id.* at 379-80. Dolan objected and sought an exception, which was declined. *Id.* at 380. In striking down the condition, the

Supreme Court determined that there must be "rough proportionality" between the condition imposed on the permit and the government's justification for that condition. *Id.* at 391. In determining rough proportionality, the Court held that "[n]o precise mathematical calculation is required, but the [government] must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.*

¶ 31 Finally, in *Sheetz v. County of El Dorado*, the Court determined that legislatively imposed fees — such as the impact fee presented in this dispute — are subject to the "essential nexus" and "rough proportionality" tests of *Nollan* and *Dolan*. 601 U.S. 267, 279 (2024).

¶ 32 Three-K-Nine does not argue that section 29-20-104.5 violates the principles adopted in *Nollan*, *Dolan*, and *Sheetz*. Instead, it argues that the disputed resolutions violate the provisions of section 29-20-104.5, implicitly acknowledging that the statute is consistent with *Nollan*, *Dolan*, and *Sheetz*. Thus, we focus our analysis on Three-K-Nine's contentions premised on the language of

16

section 29-20-104.5(1)(c) and (2)(a), mindful that our construction of the statute is subject to the noted constitutional constraints.

¶ 33    We are also guided by Colorado Supreme Court precedent addressing the proper interpretation and appropriate legislative deference we must apply when reviewing the legality of a local ordinance that imposes an impact fee.  Thus, as the supreme court explained in *Bruce v. City of Colorado Springs*, 131 P.3d 1187, 1190 (Colo. App. 2005):

> While the amount of the fee must be reasonably related to the overall cost of the service, mathematical exactitude is not required, and the particular mode adopted by a city in assessing the fee is a matter of legislative discretion.  *Bloom v. City of Fort Collins*, [784 P.2d 304 (Colo. 1989)].  Because the setting of fees is a legislative function involving many questions of judgment and discretion, we will not set aside the methodology chosen unless it is inherently unsound.

*See also Dorotik v. Town of Breckenridge*, 2026 COA 20, ¶¶ 3, 34 (applying *Bruce* when analyzing a municipal ordinance enacting a charge on short-term rental owners to "defray[] the costs of housing policies and programs for the local workforce essential to the [t]ourism economy that benefits the short-term rental [owners]" and

17

concluding that "the particular mode adopted by a city in assessing the fee is a matter of legislative discretion" and that the "methodology chosen [will not be set aside] unless it is inherently unsound" (quoting *Bruce*, 131 P.3d at 1190)).

¶ 34    With these authorities in mind, we turn to the ordinances at issue and the parties' appellate contentions.

## 2.    MAG Approach

¶ 35    In the 2022 resolution, the BOCC adopted the MAG approach to calculate the impact fee.  Huebner described the MAG approach at length in the report he submitted to the BOCC prior to the passage of the 2022 resolution and in his deposition testimony.

¶ 36    Like many Colorado mountain resort communities, the County has experienced a significant shortage of affordable housing that is needed to provide homes for those residents who work in the community.  The County determined that the existing impact fee was insufficient to meet the affordable housing needs generated by new developments.  When adopting the 2022 resolution, the County found that "the employee housing impact fees are capped at a 2015 rate and the county has collected only nominal fees from residential development in the Telluride R-1 School District . . . , and such fees

18

have been insufficient to provide mitigation for affordable housing."[1] The County adopted the MAG approach in an effort to ensure that future developments did not compound this problem.

¶ 37     As relevant on appeal, the MAG approach — as embodied in the disputed resolutions — involves three important factors.  First, it uses an employee generation rate (EGR), which the County has determined is the number of employees generated by the construction of a residential unit and those needed for its ongoing maintenance.  Second, the County's MAG approach factors in the gap between what an average employee can afford and the cost of housing in the Telluride R-1 School District, which is the area where the needed employees are likely to live.  And third, the MAG approach applies a percentage mitigation rate, which represents the portion of the affordable housing need created by the development that the developer is required to pay.[2]

---

[1] Telluride R-1 School District covers the eastern portion of the County.

[2] The formula also provides a credit if the developer elects to construct a caretaker unit on the developed property.  The credit is available if the developer places a deed restriction on the caretaker unit requiring that it be occupied by a qualified employee.  LUC § 5-1303G(XIX).

¶ 38    Three-K-Nine does not dispute that the County has a legitimate interest in mitigating the impact that new developments have on affordable housing capital facilities.  Similarly, Three-K-Nine does not contest that assessing fees on new building permits is a reasonable way to help address that impact.  Rather, Three-K-Nine attacks the data and methodology used in the disputed resolutions because, from Three-K-Nine's perspective, they result in an impact fee that is "greater than necessary" to defray the impacts on affordable housing capital facilities "directly related to [Three-K-Nine's] development."  § 29-20-104.5(1), (2)(a).

¶ 39    More specifically, Three-K-Nine argues that (1) the EGR does not "quantify the reasonable impacts of proposed development" on affordable employee housing, § 29-20-104.5(2)(a); (2) the data used to calculate the affordable housing gap result in fees that are "greater than necessary to defray" the impacts of residential development on affordable housing capital facilities, *id.*; and (3) the mitigation rate improperly seeks to remedy existing deficiencies in affordable housing, *see id.*

¶ 40    We turn now to those specific arguments.

### a. Employee Generation Rate

¶ 41 Three-K-Nine contends that the County's use of the EGR as a variable in calculating the impact fee is improper because it purportedly does not quantify the reasonable impact of new residential development on the County's workforce. Three-K-Nine does not dispute that the number of new employees generated by a development is an appropriate variable to consider when generating an affordable housing impact fee. Indeed, Three-K-Nine recognizes that "[t]he impact to be analyzed and quantified is . . . the number of employees new residential development will bring into the [C]ounty." But Three-K-Nine argues that because the EGR is based on outdated data originally generated by the 2000 study, it does not accurately quantify the number of employees generated by residential development. Relatedly, it argues that the EGR does not adequately account for recent developments in the short-term rental markets or the differences between primary and secondary homes and does not set a cap on the number of new employees generated for larger homes.

¶ 42 It is undisputed that the EGR used in the disputed resolutions is based on data from the 2000 and 2005 studies. The 2000 study

included a "Residential Job Study," the purpose of which was to develop "residential employment generation rates" to be used by "governmental jurisdictions . . . to make decisions regarding approaches to mitigate the [i]mpacts on housing demand resulting from residential development and operations. The data can be used to support impact fees . . . ." A copy of this report was appended to Huebner's 2022 report to the County.

¶ 43     The 2005 study also addressed the EGR:

> Employment generation refers to the number of employees resulting from a particular type of development of a specific size. Developing a vacant piece of land nearly always results in the need for additional employees that were not needed previously.
>
> . . . .
>
> Residential land uses generate employees both during the construction phase and after the house is built. Once a house is built, it requires employees for ongoing maintenance and services such as landscaping, cleaning, interior decorating, etc. The [2000] study determined an exponential relationship between the size of homes and the amount of employment they generate. In other words, larger homes generate the need for more employees than do smaller homes.

¶ 44    Consistent with these studies, Huebner testified in his deposition that the EGR represents the "additional employees that are generated by development" and "the effect of additional employees that are needed for either the construction or the upkeep of the . . . new homes that are created in the impact fee area."

¶ 45    It appears that the district court misapprehended at least part of the calculation of the EGR.  The court began by describing the EGR as "the increase in the size of the local workforce for which affordable housing needs to be built . . . [because] [a] residential development is predicted to need a workforce to build the development, and then to maintain it."  This is consistent with Huebner's description of the purpose of the EGR and the data relied on in the 2000 report and 2005 report.  But, as Three-K-Nine notes, the court seemed to confuse the EGR with a number utilized in a 2018 housing needs assessment — 1.6 — which referred to the number of employees occupying a typical affordable housing unit.  Nonetheless, we conclude that the error does not undermine the district court's conclusion that the EGR formula utilized by the County in the disputed ordinances did not violate section 29-20-104.5(2)(a).

23

¶ 46    Before adopting the disputed ordinances, the BOCC had before it the 2000 study explaining the methodology for calculating the EGR, the 2005 study, and Huebner's 2022 report explaining the function, purpose, and methodology for calculating the EGR. And those reports all unquestionably explain the EGR as a means of calculating the number of new employees generated by a particular development. Or as contemplated by the language of section 29-20-104.5(2)(a), the adopted formula for calculating the EGR generated a variable used to "quantify the reasonable impacts of proposed development on existing capital facilities."

¶ 47    Three-K-Nine concedes that Verdone "did not quibble with the County's employment generation methodology." Nor did Three-K-Nine or Verdone offer the County or the district court a different methodology for how to calculate the EGR. Likewise, neither Three-K-Nine nor Verdone provided a specific EGR that they believe should have been used in the MAG approach.

¶ 48    That is not to say, however, that Three-K-Nine offers no reason why the EGR adopted by the County should be rejected. It generally argues that the EGR is per se unreasonable because the County did not retain a private consultant to provide a new report

24

or otherwise update the data on which the EGR is based in accordance with industry standards before adopting the 2022 and 2023 ordinances. Relatedly, Three-K-Nine asserts that the 2000 and 2005 studies did not account for recent developments in the short-term rental market or the differences between primary and secondary homes and did not set a cap on the number of employees generated for larger homes.

¶ 49 On the latter point specifically, Three-K-Nine contends that, beyond a certain threshold, additional square footage has little, if any, effect on the number of employees generated. Three-K-Nine points to Pitkin County's impact fee methodology, which begins to plateau for homes that are 9,000 square feet or larger. As the district court noted, however, neither Three-K-Nine nor Verdone "explain[s] the math or logic behind this criticism. It is therefore impossible to compare the reasoning between the Pitkin County and San Miguel County models." Moreover, Three-K-Nine fails to articulate the particular square footage at which it believes the employee generation rate no longer reflects the number of new employees attributable to the particular development.

¶ 50     Moreover, consistent with its generalized objection, Three-K-Nine does not explain how updating the data underlying the EGR would have affected the calculation.  Nor does it explain how short-term rental markets or the differences between primary and secondary home usage should have been factored into the formula.  And it does not demonstrate how the failure to update the data or factor in the identified variables led to an improper calculation of the EGR that the County attributed to Three-K-Nine's development.

¶ 51     We are not persuaded by Three-K-Nine's appellate argument that providing specific information was unnecessary because it was "not Three-K-Nine's job" to do the County's work for it.  That argument misses the mark.  First, the BOCC had before it Huebner's expert opinion that the 2005 study, though dated, "is still valid."  Likewise the County's interrogatory responses stated that although building methods have evolved since 2005, the employees generated by current construction have remained static due to the increased complexity of residential systems.  In short, the court received evidence that the EGR based on the 2005 data remained valid.

¶ 52    Second, as the party challenging the disputed resolutions, Three-K-Nine had the burden of proving that the resulting ordinances were contrary to section 29-20-104.5. *See Town of Dillon*, ¶ 22; *Tri-State Generation*, 647 P.2d at 677. And Three-K-Nine's burden was greater than simply criticizing the particular approach that the County eventually adopted based on the prior studies and the expert opinions of its staff. As the division explained in *Bruce*, "[b]ecause the setting of fees is a legislative function involving many questions of judgment and discretion, we will not set aside the methodology chosen unless it is inherently unsound." *Bruce*, 131 P.3d at 1190. And judicial deference to a local government's discretionary legislative choices is particularly appropriate when the local government is presented with alternative formulas to calculate a reasonable fee. *See id.* ("Although the City might have chosen a different calculation for imposing this service charge, we find nothing inherently unsound in its methodology.").

¶ 53    Finally, as the district court noted, to the extent the EGR may be subject to criticism, section 29-20-104.5 does not require mathematical precision when quantifying the reasonable impacts of the proposed development. *See* § 29-20-104.5(1)(c), (2)(a) (a local

government must assess the "reasonable impacts of proposed development on existing capital facilities," and any impact fee may be "no greater than necessary to defray such impacts directly related to proposed development"). Nor does the Constitution require such precision in this context. *See Dolan*, 512 U.S. at 391 (the Constitution requires "rough proportionality"; "[n]o precise mathematical calculation is required," only that the government "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development").

¶ 54 Given these authorities, we cannot conclude that the district court erred by rejecting Three-K-Nine's arguments that the EGR used in the disputed resolutions resulted in a violation of section 29-20-104.5.

b. Allegedly Excessive Impact Fees

¶ 55 Three-K-Nine next argues that the data used to calculate the affordable housing gap results in impact fees that are far "greater than necessary to defray . . . impacts directly related to [the] proposed development." § 29-20-104.5(2)(a). We are not persuaded.

¶ 56    Three-K-Nine's contention has multiple components, and we begin by addressing a central tenet to each: the proposition that the County must calculate the affordable housing gap based on the cost of existing subsidized housing provided by the County.  Stated otherwise, Three-K-Nine argues that the County cannot rely on the free market — that is, non-subsidized housing — when calculating the affordable housing gap.  Three-K-Nine cites no authority directly supporting that proposition, and we are aware of none.  Nor does the statute prohibit the use of free market data to calculate an impact fee.  Accordingly, we turn to Three-K-Nine's specific arguments regarding the County's calculation of the affordability gap.

¶ 57    First, Three-K-Nine argues that free market housing data does not consider the cost of County-controlled or other subsidized housing.  Three-K-Nine argues that "the County's approach wrongly assumes that every worker will live in a free-market home" and that assumption is incorrect given that "at least 20% of employees presently live in County-supported housing."

¶ 58    But this argument is inapposite.  Recall that the affordable housing gap used in the MAG approach represents "the difference

29

between the free-market price of housing in the Telluride region and an amount that is affordable to those living in the community and earning 100% of the Area Median Income." The County calculated the free-market price of housing based on publicly available multiple listing service (MLS) data. Moreover, the County only considers MLS data for multi-family and condominium-like homes because they are similar in type and size to the affordable housing the County would develop. In other words, this variable is an indicator of the need for additional affordable housing, regardless of the worker's choice to live in a free-market or subsidized home.

¶ 59 Second, Three-K-Nine argues that the data used to calculate the affordable housing gap is not adjusted for things like more expensive finishes, scenic views, and "other qualities that make free-market housing more valuable than [County subsidized] housing." But Three-K-Nine does not attempt to quantify those qualities or explain how they would impact the affordable housing gap calculation. In any event, the County uses an average of the MLS data for multi-family and condominium-like homes, which is a reasonable way of reconciling the range of prices. Moreover, the County reasonably argues that to adjust for scenic view and

finishing values would inject unnecessary subjectivity into the calculations, which are avoided through the use of MLS data. We discern no error with the district court's determination that using average market data prevents particularly high-cost and low-cost homes from skewing the data and thus is reasonable for determining the market-affordability gap that the County seeks to address.

¶ 60    Next, Three-K-Nine argues that the County's methodology is invalid because it only used data from the towns of Telluride and Mountain Village, even though the impact fee applies to the entire County. Three-K-Nine argues that the limited geographic pool drawn on by the County unreasonably narrows the data. But the County selected these two towns because they are major population centers in the Telluride R-1 School District and the place where most of the workers who serve new developments reside. Moreover, the County determined that the bulk of the multi-family and condominium-like units available to employees are in those two towns, not the unincorporated area of the County. Thus, the use of this data was reasonable.

31

¶ 61 Three-K-Nine also argues that the affordable housing gap calculation does not properly account for "grant funding, tax credits, or other financial resources" that are available to help reduce the cost of developing workforce housing. As the County notes, however, the quantification of such programs is highly fact specific and uncertain. In addition, the most recent affordable housing project cited by Verdone was constructed at a cost of $525 per square foot, which is nearly identical to the cost of $527 per square foot yielded from the County's MAG approach, thus lending objective credibility to the County's calculation of cost for constructing affordable housing, without injecting the uncertainties of possible housing subsidies. And, in any event, the County was not trying to replicate the cost of constructing additional low income housing but rather intended the impact fee to be set in an amount that did not further reduce the County's existing affordable housing supply.

¶ 62 Finally, at times Three-K-Nine seems to argue that the impact fee must be married to the cost of replacing the County's existing affordable housing supply. But the MAG approach is clearly premised on a policy decision to require new development to pay the

32

lion's share of the affordable housing gap facing employees generated by such development, without the use of public subsidies. As Huebner explained in his 2022 report, "[t]he County's affordable housing program does not intend for the public sector to subsidize affordable housing requirements."

¶ 63 Under the LUC, affordable housing is defined as "[r]esidential dwelling units in the Telluride Region that are permanently deed restricted by the County's R-1 Housing Deed Restriction to limit use and occupancy to persons (and their families) who live and earn their livings primarily in the R-1 School District." LUC § 5-1305B. Thus, the County does not have to construct or have fee ownership of the capital facilities that it funds through impact fees. It can use the impact fees to subsidize projects owned by other affordable housing partners, or even privately owned homes that are deed restricted, thereby ensuring that the impact fees are used solely for housing that is deed restricted in accordance with the San Miguel Regional Housing Authority, per LUC section 5-1303G.II:

> The ownership of the Property is hereby limited
> exclusively to Employees and their spouses
> maintaining primary and sole Residence in
> San Miguel County, Montrose County, Ouray
> County or Dolores County, Colorado, and to

certain other persons and entities as permitted in Section 5-1305 of the [LUC], and the use and occupancy of the Property is hereby limited exclusively to such Employees who earn their incomes primarily within the Telluride R-1 School District and their spouses and children. . . .

In the event Affordable Housing is sold, transferred and/or conveyed without compliance with Section 5-1305 of the [LUC], such sale, transfer and/or conveyance shall be wholly null and void and shall confer no title whatsoever upon the purported transferee. Each and every conveyance of Affordable Housing, for all purposes, shall be deemed to include and incorporate by this reference all terms of that certain Section 5-1305, including but not limited to those provisions governing the sale, transfer or conveyance of property.

LUC § 5-1304A.

¶ 64    To these ends, the LUC provides that the collected affordable housing fees are to be held in a separate fund and are intended "solely for defraying the cost of capital facilities for deed-restricted, affordable housing pursuant to State of Colorado Statute 29-20-104.5." LUC § 5-1303G.V.

¶ 65    Finally, although Verdone provided several alternative methods to establish affordable housing costs, ultimately, none of his objections to or alternate ideas for the County's methodology

34

rendered that methodology unreasonable. Thus, we see no reason to disturb the district court's determination that the data used to calculate the affordable housing gap used in the MAG approach does not result in impact fees that are "greater than necessary to defray" the impacts from proposed development. § 29-20-104.5(2)(a).

### c. Mitigation Rate

¶ 66 We now turn to Three-K-Nine's contention that the mitigation rate adopted in the 2023 resolution improperly seeks to remedy deficiencies in the County's existing capital facilities. *See* § 29-20-104.5(2)(a) ("No impact fee . . . shall be imposed to remedy any deficiency in capital facilities that exists without regard to the proposed development."). We are not persuaded.

¶ 67 As previously noted, the mitigation rate is the percentage that the MAG approach applies to reduce the total impact that the new development has on the County's existing affordable housing supply. *See id.* The parties agree that the selection of a mitigation rate is largely a political decision. The percentage cannot exceed 100% because logic dictates that anything over 100% would cause the impact fee to exceed the impact created by the new

35

development, in violation of section 29-20-104.5. The political decision comes down to what percentage, below 100%, should be adopted.

¶ 68    Recall that prior to the disputed resolutions, the County assessed a flat mitigation rate of 37% on new developments. The 37% mitigation rate was initially determined by the 2005 study, which found that approximately 37% of the employees then working within the Telluride R-1 School District were living in County-subsidized housing. The 2022 resolution introduced a graduated mitigation rate depending on the square footage of the new development, as follows:

| SQAURE FOOTAGE | MITIGATION RATE |
|---|---|
| 1-1,799 | 0% |
| 1,800-2,500 | 30% |
| 2,501-3,000 | 42% |
| 3,001-4,000 | 66% |
| 4,001-12,000 | 90% |

¶ 69    But under the 2023 resolution, developments under 2,000 square feet are not assessed a mitigation fee, primarily on the rationale that developments of that size tend to be primary

residences owned by local employees.  Between 2,001 and 5,000

square feet, the ordinance sets a mitigation rate based on a

percentage of the total square footage because

> residential improvements greater than two
> thousand (2,000) [square feet] of [f]loor [a]rea
> have a strong tendency for non-resident
> occupancy, and the employee generation for
> non-resident occupied residential structures
> (second homes) is significantly greater than
> that for resident-occupied improvements
> creating impacts beyond the County's ability to
> mitigate without a fee assessed for the
> development.

LUC § 5-1303G.XI.e, .XV.

¶ 70     And for developments between 5,001 and 12,000 square feet,

the ordinance sets the mitigation rate at 90%, which is obviously

less than 100% of the new employment — and its associated

demand on the County's affordable housing supply — created by

the development.  LUC § 5-1303G.XV.

¶ 71     The previous 37% mitigation rate addressed only a portion of

the affordable housing needs generated by new developments.

While the County cannot now levy fees to make up for any prior

shortfall, *see* § 29-20-104.5(2)(a), the County can place fees on new

developments that more closely reflect the affordable housing needs

created by that development, provided the total fee never surpasses 100% of the affordable housing needs generated by the development.

¶ 72  Three-K-Nine argues that the mitigation rate should be a flat rate somewhere between 20% and 25%, which would be consistent with the current percentage of local workers living in County-subsidized housing. Basically, Three-K-Nine insists that the County must use the paradigm for setting the mitigation rate that it used in 2007 — that is, setting the mitigation rate based on the present percentage of affordable housing the County is able to provide. Because that figure has now eroded to 20-25%, Three-K-Nine argues the County is compelled to use a mitigation rate between 20% and 25%.

¶ 73  If, as Three-K-Nine argues, the County could only impose impact fees that reflect the number of people currently living in government-subsidized housing, then the County would never be able avoid the inevitable decline of available housing. Indeed, this seemed to be playing out in the County. In 2018, the housing needs assessment identified a shortage of 441 housing units and predicted that the housing shortage would increase by an additional

38

325 units by 2026 if the current 37% was maintained. As the district court found:

> To tie the mitigation rate to the existing level of service in this particular case leads to a perpetually shrinking program. The fact that the "level of service" has fallen may reflect an insufficient affordable housing program, rather than a fallen need for housing. This is the likely scenario here, as the County identified a significant housing shortage, . . . and found that the 37% mitigation was insufficient to fill it.

¶ 74    Given these facts, which Three-K-Nine does not dispute, we see no error in the district court's rejection of Three-K-Nine's argument that the mitigation rate percentage could not exceed 20% or 25%.

¶ 75    The mitigation rate percentages adopted in the 2023 resolution do not exceed 100% of the affordable housing needs generated by the development. Thus, we discern no basis to disturb the district court's determination that the 90% mitigation rate is not intended to address past deficiencies in the affordable housing supply in violation of the statute, *see* § 29-20-104.5(2)(a); rather, the rate is intended to prevent future development from creating yet more unmet demand for affordable housing. Thus, the

district court did not err by rejecting Three-K-Nine's challenge to the 90% mitigation rate.[3]

## III.  Fees and Costs

¶ 76    Three-K-Nine requests its appellate costs under C.A.R. 39. Because Three-K-Nine has not prevailed on any of the issues on appeal, we decline to award it appellate costs.  Instead, because we affirm the district court's judgment, Three-K-Nine is obligated to pay the County's appellate costs.  *See* C.A.R. 39(a)(2).

## IV.  Disposition

¶ 77    We affirm the district court's determination that the resolutions passed by the BOCC to update the impact fee structure complied with section 29-20-104.5.

JUDGE BROWN and JUDGE BERGER concur.

---

[3] At oral argument, Three-K-Nine's counsel asserted that Simonson admitted in her deposition that the impact fee adopted in the disputed resolutions is intended to redress the existing deficiency in affordable housing.  We do not read Simonson's deposition to say that.  Rather, she stated that "the level of service to me is what's actually served right now, and because, . . . it's not meeting our community needs, that level of service needs to be increased, hence the mitigation fees."  This is not an admission that the impact fee will be used to remedy "any deficiency in capital facilities that exists without regard to the proposed development."  § 29-20-104.5(2)(a), C.R.S. 2025.  Rather the impact fee is intended to prevent any further erosion of the County's affordable housing capital facilities.